IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

KORRISSA LEIGH DENNY,           )
                                )
            Plaintiff,          )
                                )
vs.                             )    Case No. 14-3143-CV-S-ODS
                                )
CAROLYN W. COLVIN,              )
Acting Commissioner of Social Security, )
                                )
            Defendant.          )

## ORDER AND OPINION AFFIRMING
## COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying her application for supplemental security income benefits under Title XVI. The Commissioner's decision is affirmed.

## I.  BACKGROUND

Plaintiff's arguments focus on (1) the ALJ's resolution of testimony from Dr. Colby Wang, Dr. Sharol McGehee, and Dr. Joseph Cools, and (2) the content of the ALJ's written decision. The Court's discussion will focus on facts relevant to these issues, which means the Court will not exhaustively discuss all of the evidence generally, or all of the medical evidence specifically.

### A.  General

Plaintiff was born in September 1994. Her mother filed an application for benefits in August 2011, before Plaintiff turned eighteen. Upon reaching the age of eighteen, Plaintiff filed an application of her own and at some point the two applications were consolidated.

The analytical framework for a minor's claim differs from the analytical framework for an adult's claim, but not in ways that matter to the resolution of this case. The issues presented concern the ALJ's findings based on the medical evidence and the sufficiency of his findings regarding Plaintiff's residual functional capacity. Neither of these issues depends on differences between an adult's and a child's claim.

Plaintiff's alleged onset date is August 19, 2011, which is also the date her mother filed the initial claim. Before then, she had dropped out of school (during her ninth grade year); the ALJ described her as a good student in middle school who participated in the gifted program, but she dropped out "because there were large groups of people. She said she had difficulty sitting still all day. After missing school for a month after a surgery, she never recovered academically and decided to drop out." R. at 19. Plaintiff began, but did not complete, home schooling, and "demonstrates little motivation" to obtain her GED. Id. Around this time period Plaintiff also began using illegal drugs (primarily marijuana); there is no suggestion Plaintiff's limitations are caused by her drug use, but the issue is relevant because Plaintiff's inconsistent statements on the matter became a factor in assessing her credibility. Id.[1]

In May 2010 – before her alleged onset date – Plaintiff went to Jordan Valley Community Health ("Jordan Valley") to establish care. There, it was noted that she had a "long history of migraine headaches" and she reported auditory and visual hallucinations that began one month prior. R. at 273. In June, her report expanded to indicate she had been experiencing hallucinations "year(s) ago." R. at 269. Medication helped resolve Plaintiff's migraines but reportedly increased the hallucinations. R. at 262, 264. Imaging studies conducted in August revealed no abnormalities. R. at 277. Subsequent visits to Jordan Valley did not address Plaintiff's mental issues until April 2011, at which time she reported self-treating her condition with marijuana and LSD. R. at 252.

---

[1]Plaintiff does not raise an issue regarding the ALJ's credibility determination. Accordingly, the Court will not exhaustively detail either Plaintiff's illicit drug use or her contradictory statements on the subject.

## B. Dr. Colby Wang

Plaintiff began seeing Dr. Colby Wang for treatment in May 2011. At her initial visit Plaintiff reported increasing auditory and visual hallucinations, insomnia, and paranoia. No clear diagnosis or treatment is mentioned, but apparently Plaintiff was already taking medication and Dr. Wang issued prescriptions of his own. R. at 285.[2] In June, Plaintiff still reported hallucinations but her mood swings were less pronounced. Dr. Wang noted Plaintiff was not anxious or depressed and that her "paranoia is 97% better." He diagnosed her as suffering from a psychotic disorder, not otherwise specified and added Risperdal to her medications (which apparently already included Seroquel and Topamax, among others). R. at 284. In July Plaintiff reported she was not hearing voices as much and she was sleeping well. R. at 448.

In August 2011, Plaintiff reported uneven results regarding paranoia, but her hallucinations appeared only occasionally and she believed she could "do things during the day, instead of feeling bad and staying in bed." During this visit Plaintiff reported that she had a relative who suffered from schizophrenia, and Dr. Wang noted that a diagnosis of schizophrenia needed to be ruled out. In the meantime, Plaintiff's medication was not changed except for the addition of Invega – a medication used to treat schizophrenia. R. at 283. The following month Plaintiff was sleeping well and she denied sad or depressed feelings; her mother described her as "indifferent." Dr. Wang discontinued the Invega and started her on Geodon and Trileptal; the former is used to treat schizophrenia and bipolar disorder and the latter is used to treat seizures. R. at 282. However, Dr. Wang did not – during this visit, or ever after – formally diagnose Plaintiff as suffering from schizophrenia. In fact, the note from this visit indicates no EEG was performed. R. at 282. During a visit later that month, Dr. Wang diagnosed Plaintiff as suffering from moderate ADHD, social anxiety disorder, migraine headaches, and bipolar disorder. R. at 281. In October, Dr. Wang's diagnoses were ADHD, bipolar disorder, and "infrequent migraines." He prescribed Vyvanse to help with hyperactivity but Plaintiff refused to take it. R. at 280.

---

[2]Many of Dr. Wang's notes are handwritten, and are also very hard to read. The Court has done its best to review their contents.

3

In November 2011 Plaintiff was dealing with some physical issues unrelated to her disability claim. Dr. Wang wrote that Plaintiff reported having more energy and was sleeping better, was not feeling depressed or anxious, and the auditory hallucinations were not present (no mention was made of visual hallucinations). Plaintiff's paranoia was described as "linger[ing]" and present only when she was in the shower or a dark room. R. at 331. In December, Plaintiff's irritability, paranoia and discomfort around people had decreased. Her headaches were precipitated by not taking her medication. R. at 333.

In January 2012 Plaintiff discussed with Dr. Wang the need for him to complete a Medical Source Statement ("MSS"). It was also during this meeting that Plaintiff discussed (apparently for the first time) that the "zombie apocalypse is ready to begin" and she was "prepared to survive." Dr. Wang diagnosed her as suffering from migraine headaches (resolved), mild polysubstance abuse, and disassociative disorder not otherwise specified. The Record does not contain a MSS from Dr. Wang from this visit. In February Plaintiff reported difficulty concentrating at work, and Dr. Wang indicated she was suffering from anxiety, insomnia, and visual (but not auditory) hallucinations, and diagnosed her with Bipolar I disorder and generalized anxiety disorder. R. at 335. The following month, Plaintiff reported she was using LSD, Ecstasy, and marijuana; nonetheless, she was "feeling much better" and Dr. Wang described her as "alert, oriented, well appearing female, in no apparent distress" who was "feeling much better except for her sleep." The diagnosis of bipolar disorder and generalized anxiety disorder remained unchanged. R. at 337. In April Plaintiff reported her "hallucinations and perceptual problems are slowing returning to some extent," but Dr. Wang's diagnoses did not change. He wrote that Plaintiff's seizures were controlled with medicine, and that she was not suffering from depression, anxiety, or paranoia. He also added lithium and temazepam to her list of medications (the latter to help her sleep). R. at 339-41. Plaintiff stopped using temazepam on her own in June, R. at 346, and in July Plaintiff confirmed she was still using recreational drugs; Dr. Wang's diagnosis remained bipolar disorder and generalized anxiety disorder. R. at 347. In September Plaintiff reported leaving her job (she had been working part-time at a Wal-Mart since at least February 2012) "because she was hearing people's thoughts again. She was

4

being mean to the customers. She said that it is dirty there. Bugs crawl everywhere, and 'under her skin.'" R. at 351. Dr. Wang indicated he would provide Plaintiff "an anti-psychotic medication for [occasional] discrete episodes of psychosis." R. at 352. In September, Plaintiff reported (among ailments not relevant to this proceeding) "auditory and visual hallucinations." However, Dr. Wang indicated her flow of thought was logical and sequential and that she was not suffering from psychosis. He diagnosed her as suffering from generalized anxiety disorder and bipolar disorder. R. at 353-54.

In November 2012, Plaintiff told Dr. Wang that "her paranoia and visual hallucinations . . . are not too cumbersome for her." His diagnoses remained bipolar disorder and generalized anxiety disorder. R. at 255. On that same day, Dr. Wang completed a MSS. The MSS contains no narrative explanations. Dr. Wang checked boxes indicating Plaintiff has no limitations in her ability to understand, remember, carry out, or make judgments on simple instructions, mild limitations on her ability to interact appropriately with the public, supervisors, or co-workers, and moderate limitations on her ability to respond appropriately to "usual work situations and to changes in a routine work setting." Dr. Wang also indicates Plaintiff has marked limitations in her ability to "complete a normal work-day or work-week without interruptions from psychologically-based symptoms; and to perform at a consistent pace without an unreasonable length of rest periods." A marked limitation is defined to mean a serious limitation with a "substantial loss in the ability to function." R. at 357-58.

The hearing was held on December 5, 2012. On December 20, Plaintiff reported going to the hospital because she "started to see things that followed her and would not leave." However, during the appointment her flow of thought was logical and sequential. Dr. Wang also provided Plaintiff with instructions that indicate Plaintiff was not taking the medication he prescribed to deal with hallucinations. R. at 417-18. In February 2013 Plaintiff was described as "alright." R. at 413. In May, Dr. Wang noted Plaintiff "hears much less auditory hallucinations than prior to treatment. The voices bothered her much more when they were pervasive and continuous. She has never experienced much anxiety or depression." Plaintiff also reported that her paranoia varied. Plaintiff also reported that she had lost Medicaid, had not done anything about it, and was not taking all of the medication that had been prescribed. Dr. Wang wrote

5

that Plaintiff suffered from "Schizo-affective disorder, depressed type, Dependent Personality Disorder; [and] Noncompliance with Treatment." He instructed her to re-enroll in Medicaid, continue her medications as best as she could, and return in one month. R. at 453.

### C. Dr. Sharol McGehee

In late November 2012, Plaintiff underwent a consultative examination conducted by a psychologist, Dr. Sharol McGehee. Dr. McGehee did not review any of Plaintiff's records (including those from Dr. Wang) and relied on Plaintiff's report of her symptoms and diagnoses. According to Dr. McGehee, Plaintiff acted appropriately, demonstrated no evidence of depression, anxiety, or "loose or bizarre thought associations," and her response were clear, logical, and coherent. Plaintiff "was not psychotic" and "[s]he denied hallucinations and delusions . . . ." R. at 363. Plaintiff told Dr. McGehee that she had not used LSD in the past year and that she had been diagnosed with bipolar disorder and paranoid schizophrenia. R. at 364.

Dr. McGehee administered the MMPI-2 test, and wrote that the results indicated Plaintiff was suffering from "severe emotional distress, dysthymia, agitation, worrying, and anhedonia. She diagnosed Plaintiff as suffering from paranoid schizophrenia and borderline personality disorder and assessed her GAF at 30. R. at 367.

### D. Dr. Joseph Cools

Dr. Cools was a medical expert who testified at the hearing. He never saw or examined Plaintiff and he did not discuss the case with anyone (including, presumably, Dr. Wang). R. at 75. Based on the medical records, Dr. Cools opined that Plaintiff suffered from an "organic mental disorder" of an unknown nature or etiology. R. at 79. He based this conclusion on the medication Dr. Wang prescribed, Plaintiff's symptoms, and on a supposed diagnosis of schizophrenia rendered by Dr. Wang. R. at 79, 80, 83. When questioned about Dr. Wang's supposed diagnosis of schizophrenia, Dr. Cools referred specifically to Dr. Wang's notes from June 1, 2011. R. at 88-89.

6

E.  The ALJ's Decision

The ALJ did not fully endorse the opinions offered by Dr. Wang, Dr. McGehee, or Dr. Cools.  The ALJ gave substantial weight to Dr. Wang's opinion except for his finding that Plaintiff was markedly impaired in her ability to complete a normal workday or normal workweek because it was "neither explained in the opinion, nor supported by the treatment notes for the past year . . . ."  R. at 20.  With respect to Dr. McGehee, the ALJ noted she saw Plaintiff only once "and relied heavily on claimant's self-reported history, which is only partially supported by the medical records in evidence."  In particular, Plainitff "told Dr. McGehee that she had been diagnosed with bipolar disorder and schizophrenia; however, she was never diagnosed with schizophrenia."  R. at 20-21.  Similarly, "Dr. Cools testified that Dr. Wang diagnosed schizophrenia in June of 2011 . . . .  The problem is that a review of the medical records indicates that Dr. Wang never actually diagnosed schizophrenia."  R. at 21.

The ALJ found Plaintiff retained the residual functional capacity ("RFC") to perform work at all exertional levels subject to nonexertaional limitations to work that was "more than simple but less than complex," required only simple work-related decisions and adjustment  to routine workplace changes, and required no interaction with the public and only occasional interaction with coworkers.  R. at 28.  The RFC thus mirrored Dr. Wang's opinions to the extent the ALJ found them persuasive; that is, the RFC did not include the limitation on Plaintiff's ability to complete a workday or a workweek.  Based on testimony from a vocational expert, the ALJ found Plaintiff could perform work as a bench assembler, housecleaner, laundry worker, or packager.  R. at 29.

II.  DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion.  [The Court] will not reverse a decision simply because some

7

evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

A.

As stated earlier, Plaintiff contends the ALJ erred in failing to defer to the opinions of Dr. Wang, Dr. McGehee, and Dr. Cools. The Court disagrees.

As the ALJ adopted almost the entirety of Dr. Wang's opinions, Plaintiff understandably focuses on the ALJ's failure to adopt and incorporate Dr. Wang's opinion that Plaintiff cannot complete a normal workday or workweek. Plaintiff correctly argues that Dr. Wang was Plaintiff's treating physician, but this fact does not require the ALJ to blindly accept his opinions. A treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Anderson v. Astrue, 696 F.3d 790, 793-94 (8th Cir. 2012); Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010). Here, there is nothing in Dr. Wang's treatment notes suggesting any limitations on Plaintiff's ability to complete workweek or workday, or suggesting any medical or psychological basis for such a limitation. The absence of support justified the ALJ's finding that this aspect of Dr. Wang's MSS was not entitled to deference.

Dr. Cools's opinions were predicated on a supposed diagnosis of schizophrenia. As there was no diagnosis of schizophrenia, there was no proper predicate for the rest of Dr. Cools's opinions and the ALJ was entitled to discount it. Plaintiff does not address this issue and instead contends that Dr. Cools's opinion was based on Plaintiff's symptoms. However, Dr. Cools also acknowledged the treating source has a greater ability to evaluate a patient, R. at 92, and emphasized that he was not

8

purporting to second-guess Dr. Wang and instead was relying on Dr. Wang, R. at 89 – but as Dr. Wang did not diagnose Plaintiff as suffering from schizophrenia, then Dr. Cools's opinion that she did is either (1) second-guessing or (2) an error. Finally, Dr. Wang's treatment records do not suggest the degree of limitations suggested by Dr. Cools. The Record provided substantial evidence supporting the ALJ's assessment of the medical expert's opinion.

Similarly, Dr. McGehee relied on Plaintiff's report that she suffered from schizophrenia. In fact, Dr. McGehee relied heavily information provided by Plaintiff. This presents an issue, as the ALJ found that Plaintiff was not credible as a general matter and that Plaintiff's "report of symptoms escalate for her convenience." R. at 21. Significantly, Plaintiff has not challenged these findings (which, it should be noted, are supported by the Record).[3] The combined findings that (1) Dr. McGehee relied on information from Plaintiff about her history and symptoms and (2) Plaintiff was not a credible source of such information justified the ALJ's resulting finding that Dr. McGehee's opinion was not entitled to significant weight.

## B.

Plaintiff's second argument is that the ALJ's explanation of the RFC is infirm in that it lacks a narrative explaining how or why each piece of evidence in the case supports each aspect of the RFC. The argument seems misplaced, as the RFC essentially incorporates the relevant opinions from Dr. Wang's RFC. Regardless, the argument essentially attacks the form of the ALJ's opinion and not its substance, and "a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case." Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) (citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987)); see also Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir. 2001). Substantial evidence in the Record as a whole supports the ALJ's RFC

---

[3]The ALJ also found that Plaintiff's "reported symptoms seem to flare when she is doing an activity she no longer wishes to do or is engaging in illegal drug use." R. at 21. This finding is also supported by the Record, and requires caution lest one extrapolate Plaintiff's symptoms from a single visit to a longer period of time.

9

formulation, so any deficiency from the ALJ's failure to directly correlate all the evidence to the RFC – assuming it is a deficiency – does not require reversal.

### III.  CONCLUSION

The Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

|  |  |
|---|---|
|  | /s/ Ortrie D. Smith |
|  | ORTRIE D. SMITH, SENIOR JUDGE |
| DATE: April 13, 2015 | UNITED STATES DISTRICT COURT |